UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES,

                                                    13-cr-261 (PKC)

              -against-                             MEMORANDUM
                                                    AND ORDER

SAUL CABALLERO,

                        Defendant.
-------------------------------------------------------------x
CASTEL, U.S.D.J.

        Defendant Saul Caballero entered a plea of guilty to participating in two drug

conspiracies.  He now awaits sentencing and objects to an aggravating role enhancement under

section 3B1.1 of the Sentencing Guidelines.  Caballero argues that because a leadership or

managerial enhancement under the Sentencing Guidelines would render him ineligible for the

"safety valve" of 18 U.S.C. § 3553(f)(4), a finding that he had such a role has the effect of

increasing his mandatory-minimum sentence.  He argues that his role enhancement must be

proven beyond a reasonable doubt to the satisfaction of a jury, because under Alleyne v. United

States, "any fact that increases the mandatory minimum is an 'element' that must be submitted to

the jury."  133 S. Ct. 2151, 2155 (2013).

        Caballero challenges the government's assertion, adopted in the Presentence

Report (the "PSR"), that he was a leader or organizer of the two conspiracies.  This Court

conducted a two-day hearing pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979),

at which the government endeavored to prove the enhancement by a preponderance of the

evidence to the.  The parties submitted memoranda of law prior to the hearing, and, at the request

of the Court, supplemental briefing thereafter.

For the reasons explained, this Court concludes that the government has proved by a preponderance of the evidence that Caballero acted as a manager or supervisor of the underlying heroin distribution conspiracy.  As to the conspiracy to distribute crystal methamphetamine, the government has not proved that Caballero had a leadership or managerial role.  Finally, this Court joins other courts that have concluded that a jury does not need to make the findings of fact necessary to determine the defendant's eligibility for the "safety valve."

BACKGROUND

On March 26, 2014, Caballero pleaded guilty to two counts of conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A), as charged in an S15 indictment.  (Docket # 108.)  On Count One, Caballero pleaded guilty to participating in a conspiracy to distribute, or to possess with intent to distribute, 500 grams and more of methamphetamine.  (Docket # 108 at 14-15, 23.)  On Count Two, Caballero pleaded guilty to participating in a conspiracy to distribute, or to possess with intent to distribute, one kilogram and more of heroin.  (Docket # 108 at 15-17, 23.)

The PSR identifies Caballero as "the leader of this drug conspiracy."  (PSR ¶ 18.) It recommends a four-level increase to his offense level based on his leadership status, U.S.S.G. § 3B1.1(a), and groups the two conspiracy counts pursuant to U.S.S.G. § 3D1.2(d).  (PSR ¶¶ 70, 74.)  Caballero objects to portions of the PSR that purport to describe his leadership role, specifically as set forth in paragraphs 18, 29 and 64.  (Nov. 14 Tr. 4-6.)  Paragraph 18 of the PSR asserts: "Saul Caballero was the leader of this drug conspiracy.  He was the main target of the investigation due to his involvement in the distribution of methamphetamine and heroin." Paragraph 29 states that Caballero asked a co-conspirator to purchase him a plane ticket from California to Des Moines, Iowa.  Paragraph 64 states in part that Caballero's co-defendants

"were subordinate to" Caballero, "who was responsible for obtaining the heroin directly from Mexico, and who organized the various workers who helped him distribute the heroin in the Bronx, New York." The same paragraph also states that Caballero "was responsible for" flying heroin couriers into the United States, and "then relied on his workers to distribute the heroin in the Bronx, New York." It also states that Caballero "played a similar leadership role in the crystal methamphetamine conspiracy." According to paragraph 64, as leader of the crystal methamphetamine conspiracy, Caballero "led" Juan Paulino, Hector Mena and Jose Hinojosa in the drug's distribution.

At the <u>Fatico</u> hearing held on November 14 and December 17, 2014, the government called three witnesses: Special Agent Moises Walters of the Drug Enforcement Agency, and alleged co-conspirators Juan Paulino and Nancy Castaneda. The defendant called no witnesses. The Court adopted as its findings of fact all portions of the PSR to which neither side objected. (Nov. 14 Tr. at 7.) Its further findings of fact are set forth in Sections I(B) and (C) of this Memorandum and Order, and its conclusions of law are in the balance of the Memorandum and Order.

DISCUSSION

I.   The Government Has Proved that Caballero Was a Manager or Supervisor of the Heroin Conspiracy, But Has Not Proved that He Had a Leadership or Managerial <u>Role in the Crystal Methamphetamine Conspiracy.</u>

A.  The Statute Requires the Court to Make Findings of Fact Under the <u>Guidelines and Apply Those Findings to the Safety-Valve Determination.</u>

In determining a defendant's sentence, a court must consider the applicable advisory sentencing guidelines range, together with the policy statements and official commentary of the United States Sentencing Commission. 18 U.S.C. §3553(a)(4) & (5), 3553(b). The Court is not relieved of that obligation merely because of the existence of a

mandatory minimum sentence, although the mandatory minimum may influence the calculation of the guidelines range.  The determination of whether a defendant had an aggravating or mitigating role in an offense is a required part of a court's determination of the advisory guidelines range.  U.S.S.G. § 1B1.1(a)(3).

As will be discussed, in Section II of this Memorandum and Order, the "safety valve" permits a court to sentence without regard to the mandatory minimum "if the court finds at the time of sentencing" certain facts "as determined under the sentencing guidelines . . . ."  18 U.S.C. 3553(f).  Those facts include that "the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines . . . ."  Id. § 3553(f)(4).

There is no dispute that it is the government's burden to prove a sentencing enhancement under the Guidelines.  United States v. Archer, 671 F.3d 149, 161 (2d Cir. 2011).  It is also not disputed that the defendant bears the burden of proving his safety-valve eligibility.  United States v. Jimenez, 451 F.3d 97, 102 (2d Cir. 2006).  The Second Circuit has noted ambiguity as to whether the government or the defendant has the ultimate burden under section 3553(f)(4), but declined to "resolve this burden issue . . . because assuming arguendo that it is the government's burden, that mere fact does not change the quantum of proof required."  United States v. Holguin, 436 F.3d 111, 119 (2d Cir. 2006).  Each side is held to a preponderance-of-the-evidence standard, and "[w]hether it is the government's burden or the defendant's burden is not dispositive."  Id.[1]

---

[1] United States v. Jacques, 555 Fed. Appx. 41, 50 n.2 (2d Cir. 2014) (summary order), also declined to rule on whether the defendant or the government had the burden to establish a defendant's leadership role, noting that the issue had not been raised in the district court and therefore was not properly presented on appeal.

B.  The Criteria for Determining Leadership Status and Their Application to Caballero.

Under the Guidelines, if Caballero acted as an organizer or leader of a conspiracy involving five or more participants, he is subject to a four-level sentencing enhancement. U.S.S.G. § 3B1.1(a).  If he was a manager or supervisor, but not an organizer or leader, of such a conspiracy, he is subject to a three-level sentencing enhancement.  Id. § 3B1.1(b).

Comment Four to the Guidelines sets forth the following factors for "distinguishing a leadership and organizational role from one of mere management or supervision": the exercise of decision making authority; the nature of participation in the commission of the offense; the recruitment of accomplices; the claimed right to a larger share of the fruits of the crime; the degree of participation in planning or organizing the offense; the nature and scope of the illegal activity; and the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 cmt. n.4.  The Comment continues:  "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense."  Id. Similarly, whether an individual has a given title is not controlling, and a court is to consider all of an individual's conduct.  Id.

The Second Circuit has relied on the factors set forth in the Comment when distinguishing whether a defendant acted in a leadership role versus a managerial role.  See United States v. Gotti, 459 F.3d 296, 348 (2d Cir. 2006); United States v. Gaskin, 364 F.3d 438, 467 (2d Cir. 2004).  The Court "must make specific factual findings as to why a particular subsection of § 3B1.1 applies."  United States v. Ware, 577 F.3d 442, 451 (2d Cir. 2009); see also Archer, 671 F.3d at 165 ("the district court is required to make specific factual findings regarding either the number of participants or the extent of the criminal activity.").  Even if an

individual does not give direct orders to underlings, control or influence over their activities may make him the leader of a criminal scheme. United States v. Batista, 684 F.3d 333, 345-46 (2d Cir. 2012).

   In summary orders, the Second Circuit has affirmed leadership enhancements when a defendant "was involved in overseeing the distribution of cocaine" and "recruited and controlled at least one other participant in the drug ring." United States v. Silverio, 118 Fed. Appx. 541, 542 (2d Cir. 2004) (summary order). In Silverio, other participants "acted deferentially" toward the defendant, who also "was in a position in which he could require those distributors to prove to him that the police had in fact seized cocaine the distributors had been given to sell." Id. The Second Circuit has held that a four-level enhancement is appropriate "even if" a defendant "managed only one other participant, not five." United States v. Zichettello, 208 F.3d 72, 107 (2d Cir. 2000).

   An individual may be a manager or supervisor if he exercises a lesser degree of control than that of a leader or organizer. The Second Circuit has observed that "[t]he Guidelines do not define the term 'supervisor,'" but that the Court has held that a defendant acts as manager or supervisor when "he 'exercise[s] some degree of control over others involved in the commission of the offense,'" or has "a significant role" in recruiting or supervising lower-level participants. Ellerby v. United States, 187 F.3d 257, 259 (2d Cir. 1998) (per curiam) (quoting United States v. Liebman, 40 F.3d 544, 548 (2d Cir. 1994)). It has affirmed a three-level enhancement when a defendant acted as an organization's "lieutenant" who "was the person in day-to-day charge of the street-selling aspects of the operation." United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002). In United States v. Horton, 381 Fed. Appx. 7, 9 (2d Cir. 2010) (summary order), the Second Circuit held that a three-level enhancement was

appropriate because the defendant "helped negotiate prices, helped recruit certain co-conspirators, and helped direct the activity of the co-conspirators to some degree."

The Court addresses each factor set forth at comment four of section 3B1.1 as it relates to Caballero's role the heroin conspiracy.  It separately addresses the evidence related to the crystal methamphetamine conspiracy.

### 1.   The Heroin Conspiracy Involved Five or More Participants.

First, the Court concludes that the conspiracy to distribute heroin involved five or more participants.  This Court finds by a preponderance of the evidence that the conspiracy's members included, in addition to Caballero, Juan Paulino, Charlie Fernandez, Lorenzo Rivera (a/k/a Chente), Eury Rodriguez, Pedro Brito (a/k/a Leica), Effraim Rodriguez (a/k/a Chiqui), Jose Cruz, Manuel Perez and Nancy Castaneda.  (See, e.g., Nov. 14 Tr. at 48, 55-57, 68-69.) Other participants, including heroin suppliers in Mexico identified as Francisco Javier Galan Farias and Antonio Alcazar Vargas, were named at the hearing.

The government has proved by a preponderance of the evidence that the conspiracy involved five or more participants.

### 2.   Caballero Participated in Planning and Organizing the Conspiracy.

One of the factors set forth in comment 4 of the Guidelines weighs a defendant's "degree of participation in planning or organizing the offense."  In in this case, that factor overlaps significantly with other considerations set forth in comment 4, such as the exercise of decision making authority, the degree of control and authority exercised over the others, and the nature of Caballero's participation in the commission of the offense.  Based on witness testimony, particularly that of Paulino and Walters, this Court finds that Caballero was involved in several key aspects of the heroin-distribution conspiracy – including supply and sales – and

instructed other individuals as to certain assigned tasks and roles.  This factor weighs in favor of finding that Caballero acted as a manager or supervisor of the conspiracy, but, as will be discussed, the evidence falls short of proving a leadership role.

The coordination of drug couriers.  According to Walters, a confidential informant stated that Caballero orchestrated a scheme whereby Mexican couriers swallowed heroin pellets and then flew to New York City.  (Nov. 14 Tr. 36.)  Walters testified that Caballero coordinated arrangements for drug couriers arriving to the United States and supervised the receipt of narcotics after they passed through the couriers' bodies.  (Nov. 14 Tr. 45.)  Caballero was the main point of contact for these couriers.  (Nov. 14 Tr. 45.)  The couriers stayed at the apartment of Charlie Fernandez, which was located on Jerome Avenue in the Bronx.  (Nov. 14 Tr. 58.)  In the apartment, Caballero supervised the extraction process and arranged for the distribution of the heroin.  (Nov. 14 Tr. 36.)

In 2012, Caballero told Paulino to find an apartment for one drug courier arriving from Mexico, which Paulino did, at the apartment of Charlie Fernandez at 2876 Jerome Avenue in the Bronx.  (Nov. 14 Tr. 95-96.)  Nancy Castaneda thereafter arrived to New York from Mexico, and Caballero flew to New York from California to supervise the heroin-extraction process.  (Nov. 14 Tr. 96-97.)  Castaneda testified that Caballero required her to pass the heroin pellets at the Bronx apartment, rather than a hotel, as she requested.  (Dec. 17 Tr. at 12.)  Caballero asked Paulino to bring food to Castaneda.  (Nov. 14 Tr. 98.)  Caballero also supplied her with items that she needed to pass and extract the heroin pellets.  (Dec. 17 Tr. at 12.)  The heroin passed through Castaneda's body over the next day, while Caballero and Paulino were the only people in the apartment.  (Nov. 14 Tr. 98-99.)  Castaneda testified that after the heroin passed through her body, she gave the drugs to Caballero, who weighed the heroin, which totaled

approximately 900 grams.  (Dec. 17 Tr. at 14.)  While Caballero was present, Paulino ground the

heroin into a powder.  (Dec. 17 Tr. at 14.)

According to Castaneda, during her stay in the Bronx, Caballero "appeared to be

in charge."  (Dec. 17 Tr. at 17.)  She testified:

> [H]e was the person whom they directed me to from Mexico.  He
> was the person answering the phone calls.  He was the person who
> gave the orders to Shorty [Paulino] to get all of the things that I was
> to need to expel what I had.  He was the person I spoke to concerning
> the fact that I wanted to go to a hotel.  He was the one who paid me
> and he was the person who accompanied me to do things like going
> to the laundry and to go out to eat.  And all of the time he stayed
> with me.

(Dec. 17 Tr. at 17-18.)

Castaneda testified that Caballero instructed Paulino to make travel arrangements

for her return trip to Mexico.  (Dec. 17 Tr. at 18.)  According to Paulino, Caballero permitted

only Paulino, Fernandez and Castaneda to enter the apartment because he did not want anyone

"to see his face" or to see Castaneda.  (Nov. 14 Tr. 101.)  Both Paulino and Castaneda testified

that Castaneda was not left alone in the apartment.  (Nov. 14 Tr. 105; Dec. 17 Tr. at 15.)

While in transit to New York for a second delivery of heroin in March 2013,

Castaneda was arrested in Philadelphia.  (Dec. 17 Tr. at 18-21.)  For the second delivery, she had

swallowed 58 pellets of heroin.  (Dec. 17 Tr. at 19.)  Castaneda testified that Caballero purchased

the ticket for her flight from Los Angeles to New York, with a layover in Philadelphia.  (Dec. 17

Tr. at 19-20.)  Caballero also had made Castaneda's hotel arrangements in Los Angeles.  (Dec.

17 Tr. at 19-20.)  Upon arrival to Philadelphia, she called Caballero to update him on the trip,

and was arrested shortly thereafter.  (Dec. 17 Tr. at 20.)

Caballero's counsel contends that he had no managerial or supervisory authority

over Castaneda, who was instead controlled by two individuals in Mexico: Francisco Javier

Galan Farias and Antonio Alcazar Vargas.  (See Docket # 210 14-15.)  Castaneda testified that she worked with these individuals prior to encountering Caballero, including work as a methamphetamine dealer.  (Dec. 17 Tr. 4-5.)  They supplied her with the heroin that she transported to the Bronx.  (Dec. 17 Tr. 7-8.)  Castaneda testified that they gave her instructions for her trips and determined how much she would be paid; helped her secure a travel visa; provided her money for a plane ticket; and instructed her to travel to New York.  (Dec. 17 Tr. 9, 15, 18, 25, 32.)  Only after Castaneda arrived to New York did she contact Caballero and receive the instruction to go to Jerome Avenue.  (Dec. 17 Tr. 9-10.)

However, the control that Farias and Vargas exercised over Castaneda in Mexico does not alter or minimize Caballero's role with his co-conspirators in New York.  As a drug courier, Castaneda took direction from Farias and Vargas concerning the heroin delivery, until she arrived to New York, where she took direction from Caballero.  Farias and Vargas supplied the heroin to Caballero and his co-conspirators, and in that capacity they exercised control over Castaneda; while in New York, Caballero had decision-making authority over Castaneda, and oversaw the process wherein Castaneda passed the heroin pellets and the drug was prepared for distribution.  That Farias and Vargas had authority over Castaneda in Mexico does not undermine Caballero's authority in New York.

Caballero also oversaw the activities of other couriers.  In 2011, at Caballero's instruction, Paulino purchased two airline tickets from Mexico to New York so that couriers could transport heroin.  (Nov. 14 Tr. 93-94.)  Based on conversations with Caballero, Paulino understood that he was to distribute the heroin, and that Caballero would be paid $70,000 per kilo.  (Nov. 14 Tr. 94.)  Caballero later received a call informing him that both couriers had been arrested.  (Nov. 14 Tr. 95.)

Paulino testified that in the summer of 2012, two additional heroin couriers stayed in the Fernandez apartment, and transported approximately 950 grams of heroin during their stays.  (Nov. 14 Tr. 105-07.)

The supervision of customer payments and sales.  Caballero expressed frustration to Charlie Fernandez that Paulino had not yet received payment from a heroin purchaser in Pennsylvania, and demanded that Paulino collect from her.  (Nov. 14 Tr. 40-43.)  Caballero stated to Fernandez that if the buyer did not pay her debt, they would not be permitted to receive future heroin shipments from Mexico.  (Nov. 14 Tr. at 40.)

After heroin was extracted from the couriers, Paulino functioned as a type of middleman, arranging for dealers to purchase 100-200 grams to resell to their own customers.  (Nov. 14 Tr. 99.)  Caballero required all purchases to be fully paid before the heroin changed hands.  (Nov. 14 Tr. 99-100.)  Paulino identified his purchasers as including Charlie, Chiqui, Bokera, Eury, and an uncle.  (Nov. 14 Tr. 100.)  Paulino then paid Caballero a share of those sales proceeds.  (Nov. 14 Tr. 101.)

Paulino testified that Caballero urged him to sell heroin quickly, because the faster that it was sold, the faster another courier could arrive with a new shipment.  (Nov. 14 Tr. 109.)

The wiring of heroin payments to Mexico.  Walters testified that Paulino sent proceeds from heroin sales to Mexico using fictitious names supplied by Caballero.  (Nov. 14 Tr. 39.)  The ultimate recipient was an individual named Javier.  (Nov. 14 Tr. 39.)  Paulino testified that Caballero arranged for money transfers to Mexico for heroin shipments, and that Paulino coordinated those money transfers through an agency on Jerome Avenue.  (Nov. 14 Tr. 102-04.)  According to Paulino, only Caballero directly spoke to the suppliers.  (Nov. 14 Tr. 104-05.)

    <u>Out-of-Town Meetings.</u>  Paulino testified that Caballero arranged a meetings in Rochester, NY and Connecticut to discuss drug procurement.  (Nov. 14 Tr. 87-88.)  Paulino accompanied Caballero on these trips because Paulino had purchased a van at Caballero's direction.  (Nov. 14 Tr. 89-90.)

    3.  Caballero Exercised Decision-Making Authority over the Heroin <u>Conspiracy.</u>

    The testimony of Paulino and Castaneda supports the conclusion Caballero exercised decision-making authority over the enterprise.  As discussed in relation to Caballero's role in planning and organizing the conspiracy, Caballero directed the actions involving key aspects of the conspiracy, including the purchase of plane tickets for drug couriers, the logistics of courier accommodations in the Bronx, the extraction of heroin from couriers and the payment process on the sales.  He issued these instructions to Paulino, Castaneda and others.

    4.  <u>Caballero Participated Extensively in the Heroin Conspiracy.</u>

    The above-discussed testimony of Walters, Paulino and Castaneda demonstrate that Caballero planned and directed several critical aspects of the conspiracy.

    5.  <u>Caballero Recruited Paulino to the Conspiracy.</u>

    Paulino testified that in 2011, Caballero arranged for the two of them to meet at a restaurant on Jerome Avenue in the Bronx, where Caballero asked Paulino if he would sell cocaine procured by Caballero.  (Nov. 14 Tr. 85-86.)  According to Paulino's testimony, this was the beginning of his involvement in selling narcotics with Caballero.  Thus, the evidence shows that Caballero recruited a willing Paulino to participate in this conspiracy.  However, because Paulino had an extensive history of dealing narcotics, and was placed in touch with Caballero via a mutual acquaintance, this consideration does not weigh heavily in assigning a leadership or managerial role to Caballero.

### 6.   Caballero Retained a Large Share of the Proceeds on Heroin Sales.

Paulino testified that he received a significantly smaller portion of the proceeds from the transactions than Caballero.  In 2011, Caballero arranged a shipment of five marijuana packages to Paulino, who sold the marijuana and then paid Caballero for the shipment.  (Nov. 14 Tr. 91-92.)  Paulino paid Caballero $2,500 per package, and Paulino netted $500 per package.  (Nov. 14 Tr. 92.)  Paulino also testified that for each kilogram of heroin sold, Caballero received $70,000, and Paulino received between $12,000-15,000.  (Nov. 14 Tr. 102.)

The testimony does not shed light on how much of the proceeds received by Caballero were net profits to him; a logical inference is that a portion of the proceeds paid to Caballero were owed to persons in Mexico for cost of the heroin.  Nevertheless, Caballero's substantially larger share of the proceeds supports the conclusion that Caballero had a higher role in the conspiracy.

### 7.   The Nature and Scope of the Heroin Conspiracy Were Extensive.

As discussed, the testimony shows that Caballero used couriers flown in from Mexico, made and oversaw heroin distribution by Paulino in the Bronx, and made payments to suppliers in Mexico.  The conspiracy involved extensive travel and coordination among several individuals.

### 8.   Caballero Exercised Control and Authority over Others.

Walters testified that Paulino was frustrated at times because Caballero treated him "basically like his servant," and required him to get food, do his laundry and arrange for money transfers.  (Nov. 14 Tr. 46.)  The testimony of Paulino and Walters demonstrates that Caballero monitored activities relating to couriers and required timely payment from Paulino's customers.  As also noted, Paulino also testified that Caballero was concerned about limiting

access to the Fernandez apartment, which housed the heroin couriers, in order to limit the risk that Caballero and the couriers would be identified.

Caballero's counsel has pointed to multiple instances in which Paulino purchased heroin from other suppliers before selling it to end users. Paulino testified in some detail that he did not rely exclusively on Caballero to supply him with heroin, and that he purchased heroin from suppliers identified as Pachenga, El Don and Eury. (See, e.g., Nov. 14 Tr. at 112.) He testified that Caballero supplied purer heroin than the others. (Nov. 14 Tr. 113.)

While relevant, Paulino's interaction with other suppliers is not dispositive as to whether Caballero managed or supervised this conspiracy. Paulino may well have functioned as an independent contractor – sometimes selling heroin obtained by Caballero, and other times selling drugs from other sources. However, this does not alter the nature of Caballero's relationship with Paulino during the course of and in furtherance of the conspiracy.

> 9.  Having Weighed the Relevant Factors, this Court Concludes that the Government Has Proved that Caballero Was a Manager or Supervisor of the Charged Conspiracy.

The government has proven by a preponderance of the evidence that Caballero was a manager or supervisor of this heroin-distribution conspiracy. The Court credits the testimony of Paulino and Castaneda that Caballero supervised the key aspects of obtaining and distributing the heroin: he made transportation arrangements for couriers; provided their accommodations in the Bronx and remained with the couriers while they passed the heroin; controlled who was permitted on the premises; and oversaw the weighing and preparation of the incoming shipments. The testimony of Castaneda and Paulino showed that Caballero exercised authority over the extraction process and the individuals involved.

Caballero directed and arranged for payments to Mexico for the heroin shipments, and gave Paulino orders as to wiring the payments.  He directed Paulino to sell the heroin quickly, so that he could make payments for future shipments.  Caballero instructed Paulino that purchasers must pay immediately, and, when one purchaser delayed payment, pressured Paulino to collect.  Caballero recruited Paulino to sell heroin for him.  Caballero retained a significantly larger share of the proceeds in the conspiracy.

The Court concludes that Caballero directed the actions of his co-conspirators. However, his conduct was consistent with the role played by a manager or supervisor of his co-conspirators, rather than as a leader or organizer.  Caballero's counsel argues that he functioned merely as a broker, who received incoming shipments of heroin and facilitated its subsequent purchase by Paulino and others.  This characterization understates Caballero's involvement in the furtherance of this conspiracy.  He issued instructions to his co-conspirators and managed key logistics to procure, transport, pay for and distribute heroin.  These responsibilities and activities are consistent with the role of a manager or supervisor.  See, e.g., Blount, 291 F.3d at 217 (affirming managerial enhancement when a defendant acted as an organization's "lieutenant" who "was the person in day-to-day charge of the street-selling aspects of the operation."); Horton, 381 Fed. Appx. at 9 (managerial enhancement appropriate because the defendant "helped negotiate prices, helped recruit certain co-conspirators, and helped direct the activity of the co-conspirators to some degree.").

At the same time, Caballero did not exercise the heightened control associated with an enhancement as leader or organizer.  His close supervision of Castaneda was complementary to the instructions she received from her two associates in Mexico, who were the individuals ultimately responsible for directing her to the Bronx.  He did not recruit Castaneda

into the conspiracy, and Paulino had his own long history of dealing narcotics at the time that Caballero recruited him. Although Caballero issued instructions to Paulino, Paulino also had his own network of purchasers. Caballero set parameters as to payment and collection for Paulino's sales, but the evidence indicates that he used only limited measures to enforce them. For example, when one of Paulino's customers had not yet paid for a purchase, Caballero only expressed frustration to Charlie Fernandez, and apparently took no direct action to coerce Paulino to collect. (Nov. 14 Tr. 40-43.) Caballero's authority and role therefore do not reflect the level of control consistent with a leader or organizer. See generally Batista, 684 F.3d at 345-46; Gaskin, 364 F.3d at 467; United States v. Farah, 991 F.2d 1065, 1066 (2d Cir. 1993) (affirming a defendant's role as supervisor when his duties included courier supervision and coordination, receipt and delivery of heroin, payments for shipments and money-laundering arrangements).

Given the extent of Caballero's authority in the conspiracy, and the control that he exercised over Paulino and Castaneda, the government has proven that Caballero was a manager or supervisor of the conspiracy.

### C.  The Government Has Not Proved that Caballero Had a Leadership or Managerial Role in the Crystal Methamphetamine Conspiracy.

The Court concludes that the government has not proved by a preponderance of the evidence that Caballero acted as a manager or supervisor over the crystal methamphetamine conspiracy.

The testimony supports the conclusion that five individuals were identified as members of the crystal methamphetamine conspiracy: Caballero, Paulino, Luis Jimenez, Hector Mena and Eury Rodriguez.[2]  Thus, the conspiracy consisted of five or more individuals.

The evidence of Caballero's claimed leadership or managerial position is limited to two transactions, one in New York and one in Iowa.  Paulino credibly testified that in 2012, an individual known to him only as "Hector" arrived in New York and told Caballero that he had one pound of methamphetamine.[3]  (Nov. 14 Tr. at 114.)  Caballero asked Paulino whether he had "any knowledge about – of this."  (Nov. 14 Tr. at 114.)  Paulino responded that he "didn't have any knowledge of it," but that he would talk to his customers "to see if I could sell it.  And I spoke to Eury, and Eury said that he had a friend who would buy it."  (Nov. 14 Tr. at 114.)  Hector then arrived at a parking lot designated by Caballero.  (Nov. 14 Tr. at 114.)  Either Hector or Caballero explained that tools were needed "in order to get the methamphetamine out of the car."  (Nov. 14 Tr. at 114.)  Paulino testified: "The next day we went to buy the tools, to pull out the methamphetamine from the car.  Eury says he's got half of the money.  He said that he couldn't give him all of it because his person had to see what the quality of the methamphetamine was."[4]  (Nov. 14 Tr. at 114-15.)  Paulino testified that Hector then gave the methamphetamine to Eury, who sold it, and also testified that he had never met Hector prior to Caballero's introduction.  (Nov. 14 Tr. at 115.)

---

[2] Walters identified Luis Jimenez as a supplier of crystal methamphetamine, and Hector Mena as a distributor. (Nov. 14 Tr. at 47-49.)  Paulino testified that he distributed methamphetamine beginning in 2012, and that Caballero was involved in the conspiracy.  (Nov. 14 Tr. at 114.)  Paulino testified that Eury sold methamphetamine provided by Mena.  (Nov. 14 Tr. at 114-15.)

[3] Presumably, the "Hector" identified by Paulino is defendant Hector Mena, who Walters identified as a crystal methamphetamine distributor.

[4] Although it is not entirely clear, it appears that Paulino is stating that Eury Rodriguez told Hector Mena that he could not yet pay for all of the methamphetamine because his associate first needed to test the drug's quality.

Walters testified about a second, unsuccessful transaction that took place in Des Moines, Iowa.  Walters testified that Caballero, while located in California, instructed Hector Mena to drive to Des Moines, Iowa "because Caballero had a customer for him at Des Moines, Iowa."  (Nov. 14 Tr. at 49.)  Caballero separately instructed Paulino to purchase him a plane ticket from California to Des Moines.  (Nov. 14 Tr. at 49.)  A DEA agent obtained a search warrant for Mena's car in Iowa, and found five pounds of crystal methamphetamine.  (Nov. 14 Tr. at 49.)

Neither the transaction in the Bronx nor the events in Iowa prove by a preponderance of the evidence that Caballero had a leadership or managerial role in the conspiracy.  Paulino's testimony about the Bronx transaction mainly involves the conduct of Hector Mena and Eury Rodriguez:  Upon Mena's arrival with methamphetamine, Caballero inquired of Paulino whether he knew of a potential purchaser, but Caballero played no other role in guiding the underlying events.  His participation in locating tools to extract the methamphetamine from the vehicle, though consistent with participation in the conspiracy, does not go toward a leadership or managerial role.  The testimony does not establish that Caballero guided events or directed others.

Similarly, the events in Iowa center on Mena's conduct.  Caballero may have identified a potential methamphetamine purchaser, but there is no evidence that he otherwise guided Mena's actions.  There is no evidence that Caballero supervised the courier process or monitored the drug's preparation and sales.  Agent Walters testified that Caballero instructed Paulino to purchase him an airline ticket to Iowa, but that act alone does not further establish Caballero as a leader or manager during the failed Iowa transaction, or otherwise prove that he was a leader or manager of the crystal methamphetamine conspiracy.

To the extent that Caballero objects to the PSR's characterization of Caballero as a leader of the crystal methamphetamine conspiracy, the objection is sustained.

II.  <u>Alleyne</u> Does Not Require a Jury to Determine Caballero's Safety-Valve Eligibility.

Caballero argues that a jury must determine whether he had a leadership or managerial role in the narcotics-distribution conspiracies.  He contends that if he is found ineligible for the safety valve under 18 U.S.C. § 3553(f)(4), it would have the effect of increasing his mandatory-minimum sentence, and that only a jury may make such a finding by proof beyond a reasonable doubt.

This argument is premised on <u>Alleyne</u>, which held that the Sixth Amendment's guarantee of trial by jury applies to "any fact that increases the mandatory minimum," because such a fact "is an 'element'" of the underlying offense.  133 S. Ct. at 2155.  In <u>Alleyne</u>, because the defendant was found to have brandished a firearm, his mandatory-minimum sentence increased from five years to seven years.  <u>Id.</u> at 2160.  The Supreme Court concluded that "[e]levating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's 'expected punishment has increased as a result of the narrowed range' and 'the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish.'"  <u>Id.</u> at 2161 (quoting <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 522 (2000) (Thomas, J., concurring)).  When such a finding of fact elevates a defendant's prescribed punishment, it becomes an element of a crime, and must be found by a jury beyond a reasonable doubt, <u>Alleyne</u> concluded.  133 S. Ct. at 2162-63.

Caballero contends that denying him safety-valve eligibility is the equivalent to raising his mandatory-minimum sentence.  As such, he argues, a finding of leadership is an element of the underlying offense, and must be found by a jury beyond a reasonable doubt.  This

Court concludes that the principle articulated in <u>Alleyne</u> does not apply to a Guidelines finding that disqualifies a defendant from the safety valve.

It is useful to begin with the statute creating the safety valve and its application to Caballero, mindful that this is not necessarily dispositive of the constitutional issue.  Lawmakers created mandatory minimum sentences.  In his plea allocution, Caballero indisputably admitted all elements necessary to the application of the mandatory minimum.  He admitted to participation in a conspiracy to distribute one kilogram and more of heroin and 500 grams and more of methamphetamine.  (Docket # 108 at 14-16, 21-22.)  This is sufficient to trigger a mandatory minimum sentence of 10 years on each conspiracy count.  21 U.S.C. §§ 846, 841(b)(1)(A)(i), (vii).

The Court is required to determine the advisory guidelines range applicable to Caballero as one factor under 3553(a).  18 U.S.C. § 3553(a)(4).  This necessarily requires a finding of whether a role enhancement under U.S.S.G. § 3B1.1 is warranted.  U.S.S.G. § 1B1.1(a)(3).  The government must prove such an enhancement by a preponderance of the evidence.  <u>Archer</u>, 671 F.3d at 161.

The statute providing relief from the mandatory minimum expressly requires judicial fact-finding "at sentencing," and not at trial.  It also requires that the fact-finding be made under the Guidelines:  "Notwithstanding any other provision of law . . . the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission . . . . without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that . . . the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines . . . ."  18 U.S.C. § 3553(f)(4).  The

phrase "the court finds at sentencing" is inconsistent with a jury making such a finding at trial, or even at a separate trial convened at sentencing.  Taken to the logical extreme, defendant's argument would require a jury to determine whether a defendant has truthfully disclosed to the prosecutors "all information and evidence . . . . concerning the offense or offenses . . . ."  18 U.S.C. § 3553(f)(5).  The Court concludes that section 3553(f) does not contemplate a jury's role in fact finding.

But a construction of the safety-valve statute does not resolve the constitutional issue.  Alleyne teaches that each element necessary to impose the mandatory minimum must either be (a) proven beyond a reasonable doubt to the satisfaction of a jury, or (b) admitted by the defendant.  133 S. Ct. at 2158; see also United States v. Booker, 543 U.S. 220, 244 (2005).  Here, Caballero admitted each element required for the imposition of the mandatory minimum, and, thus, the mandatory minimum may be imposed without more.  In establishing the mandatory minimum, lawmakers allowed a defendant to escape its application under certain circumstances, including through application of the safety valve.  This statutory lenity does not enhance the punishment, but rather, potentially lessens it.

This Court concludes that judicial fact finding under the Guidelines, which is then examined to determine safety-valve eligibility, does not offend any constitutional principal.  This holding is consistent with other tribunals that have addressed the issue.  In Jacques, 555 Fed. Appx. at 50, the Second Circuit, in a non-precedential opinion, rejected a defendant's argument that Alleyne requires a jury to decide whether the safety valve applied.  It noted Alleyne's holding that a jury must determine facts that increase a mandatory-minimum sentence, but added that "the inverse does not follow; neither Apprendi nor Alleyne instructs that facts that prevent a defendant from avoiding the statutory minimum penalty authorized by the jury's verdict must

also be found by the jury."  Id.  It held that the safety-valve statute "raised neither the applicable statutory minimum nor maximum penalty," and that a jury was not required to determine its applicability.  Id.[5]

Other courts have reached conclusions similar to Jacques.  United States v. Harakaly, 734 F.3d 88, 98 (1st Cir. 2013), concluded that "[a] fact that precludes safety-valve relief does not trigger or increase the mandatory minimum, but instead prohibits imposition of a sentence below a mandatory minimum already imposed as a result of the guilty plea or jury verdict."  It observed that in section 3553(f), Congress "command[ed]" courts to decide safety-valve factors; that any denial of safety-valve treatment would necessitate a jury's involvement; and that requiring the government to disprove safety-valve eligibility beyond a reasonable doubt would be administratively unworkable.  Id.; see also United States v. Lizarraga-Carrizales, 757 F.3d 995, 999 (9th Cir. 2014) ("the denial of safety valve relief does not increase the statutory maximum or minimum such that Alleyne is implicated."); United States v. King, 773 F.3d 48, 55 (5th Cir. 2014) ("[T]he safety valve does not increase the mandatory minimum; instead, it removes it.  Accordingly, Alleyne is not directly applicable."); United States v. Silva, 566 Fed. Appx. 804, 808 (11th Cir. 2014) (summary order) (adopting Harakaly's reasoning as "persuasive"); United States v. Juarez-Sanchez, 558 Fed. Appx. 840, 843 (10th Cir. 2014) (denial of the safety valve did not increase defendant's mandatory-minimum sentence, thus rendering Alleyne inapplicable); United States v. Aboulhorma, __ F. Supp. 3d __, 2014 WL 5786907, at *3 (E.D. Va. Nov. 6, 2014) ("the applicability of the safety valve does not implicate Alleyne.").

---

[5] The Second Circuit applied plain-error review to this argument, noting that it was not raised to the district court. Id. at 50.

The reasoning of these decisions is persuasive.  Section 3553(f) does not establish a mandatory-minimum sentence, but instead authorizes a court to sentence the defendant without regard to the mandatory minimum.  Its criteria therefore do not constitute an "element" of an offense under <u>Alleyne</u>.

Caballero's constitutional challenge to a judicial determination of his leadership or managerial role by a preponderance of the evidence standard is denied.

CONCLUSION

For the foregoing reasons, the Court finds that Caballero acted as a manager or supervisor of the heroin conspiracy, and not a leader or organizer.  The Court finds that he had no leadership or managerial role in the conspiracy to distribute crystal methamphetamine.

The defendant's motion for a jury determination as to a leadership or managerial role in the conspiracies is DENIED.  (Docket # 163.)  The Clerk is directed to terminate the motion, and to terminate the related letter motion.  (Docket # 201.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
         February 24, 2015